# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ESTEBAN SANCHEZ RODRIGUEZ,

        Plaintiff,

v.                                     CIV 01-836 KBM/LCS – ACE

LAURA MILLER, M.D., et al.,

        Defendants.

# MEMORANDUM OPINION AND ORDER

## I.  Overview

Plaintiff was a pretrial detainee at the Doña Ana County Detention Center for six months while awaiting disposition of pending drunk driving and other related charges.  He brings this action against Dr. Laura Miller, the jail physician who attended him during his incarceration; Melanie Benavidez and Esther Raquel Montgomery, jail medical technicians who attended him; Jeffrey Garbow and Joe Alvarez, jail administrators; and The Board of County Commissioners of Doña Ana County ("Board").[1]  This court has jurisdiction solely by virtue of Plaintiff's allegations

---

[1]  The captions of the filed complaints do not specify whether the individuals are sued solely in their individual capacities and the content of the complaints do not clarify the issue.  Although the Board was named as a Defendant from the outset, Plaintiff did not assert a claim against it until he tendered his proposed second amended complaint.  Even so, the caption still fails to clear up the ambiguity.  From the context of what Plaintiff now intends to seek from the Board, however, I will conclude that he is also proceeding against the individual defendants in their official capacities.  *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 14 (1985); *Houston v. Reich,* 932 F.2d 883, 885 (10th Cir. 1991).  Plaintiff dismissed his claims against Defendant Thomas Lascari, the privately-employed mental health counselor who saw him on two occasions shortly before he was released from the detention facility.  As such, Lascari's motion for summary judgment is moot.  *See Docs. 52, 112.*

under 42 U.S.C. § 1983.

The case is presently before the Court on a number of motions: Dr. Miller's and the County Defendants' motions for summary judgment, *Docs. 50, 54;* Plaintiff's remaining motion to file a surreply, *Doc. 88;* and Plaintiff's motion to file a second amended complaint to add a § 1983 claim against the jail administrators and Board, and state law claims against the Board, *Doc. 90.* In his written responses to the motions for summary judgment, Plaintiff requests a continuance to conduct further discovery and take depositions.

Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties consented to have me serve as the presiding judge and enter final judgment. Since holding a hearing on the motions, I have decided to permit Plaintiff to file the surreply and have reviewed all of the submissions and relevant authorities in detail. I conclude that the undisputed and material facts do not rise to the level of a constitutional violation for denial of medical care, and that the discovery Plaintiff wants to conduct will not change that result.

For that reason, raising an additional § 1983 claim for failure to provide medical care failure to protect, and failure to train against the jail administrators and Board would be futile. Because the federal medical care claims are not actionable, I need not address whether the individual defendants would be entitled to qualified immunity if a constitutional violation had occurred.

Because all the federal claims are not viable, I must decide whether to exercise supplemental jurisdiction over the remaining state claims under 28 U.S.C. § 1367(c)(3). There may be compelling reasons for the New Mexico courts to decide the remaining claims in the first instance, but the parties have not yet been afforded the opportunity to be heard. Accordingly, I

will set a hearing on the issue of whether supplemental jurisdiction should be exercised.

## II.  Factual Background

### A.  Spinal Tumor Discovered

The facts are undeniably tragic.  After being incarcerated for three months, Plaintiff slipped in the shower in late June 1999.  On July 1, 1999, he went to the infirmary because his back hurt.  Over the course of the next eleven weeks until he was released from the detention facility on September 14, 1999, Plaintiff was examined and treated by medical technicians and/or Dr. Miller on numerous occasions.  Dr. Miller believed that some of Plaintiff's symptoms were exaggerated or manifested from a psychological origin.

Upon his release, Plaintiff's family took him to the emergency room where he received an "MRI" scan.[2]  According to Plaintiff's expert, Dr. William Hiltz, the MRI "showed a bony lesion at T7" and, three days later, surgeons removed an "extradural plasmocytoma" from the area.  *See Doc. 57,* Exh. 2 (attachment at 6).  Plaintiff subsequently developed other medical problems but is not completely paralyzed.[3]  Nevertheless, for the purpose of this discussion I will refer to the MRI discovery as a "cancerous tumor" and characterize Plaintiff's present condition as "paralysis."

---

[2]  The acronym for "magnetic resonance imaging."

[3]  For example, Plaintiff's expert goes on to describe that after undergoing three months of rehabilitation therapy, doctors discovered 'other malignant lesions  . .. leading to a diagnosis of multiple myeloma and courses of chemotherapy. . . .  In early 2000, [Plaintiff] was readmitted . . . for lung abscess complicated by septicemia, for which he received a lobectomy [Plaintiff suffered a punctured lung seven years before entering detention facility in March 1999]."  Dr. Hiltz describes Plaintiff as having "slight feeling from the waist down," and if "helped he can stand with support for about five minutes, but cannot walk at all without crutches, and can only go about ten feet with them."  *Doc. 57,* Exh. 2 (attachment at 6).

## B. Medical Care Plaintiff Received While Incarcerated

The medical care Plaintiff did receive while incarcerated is detailed in Plaintiff's medical records and described in Dr. Miller's affidavit and the transcript of the hearing. *See Doc. 55,* Exh. A & attachments (hereinafter "Dr. Miller Aff." and "Treatment Notes"); *Doc. 51,* Exh. 3 & attachments (hereinafter "Roach Aff."); Transcript of Hearing 5/14/02. Nowhere does Plaintiff dispute that he received the care outlined in the notes. *See Doc. 57,* Exh. 1; *Doc. 88,* Exh.S-2. (hereinafter collectively referred to as "Plf. Aff."). I briefly summarize the daily entries below.

***July 01, 1999:*** Medical staff saw Plaintiff, who reported that he slipped in the shower three days before and was suffering from back pain. Staff referred him to Dr. Miller who diagnosed a back strain and prescribed Motrin and heating pad.

***July 12, 1999:*** Medical staff notes indicate that Plaintiff reported that his symptoms were resolved and he was in no acute distress.

***July 20, 1999:*** Medical staff saw Plaintiff, who reported that he was experiencing back pain again. Staff referred him to Dr. Miller. Dr. Miller noted that Plaintiff reported he had no history of back problems, was experiencing pain in his low spine which interfered with his sleep, and that he was "fearful, anxious about court problems." *Treatment Notes,* at 2. Among other things,[4] she observed that the way he walked and flexed was within normal limits. She also observed "no palpable muscle spasm. No consistent area of back pain — points to different areas of T-spine and upper L-spine — bilaterally across entire posterior trunk." *Id.* She assessed his symptoms were of psychological origin. She prescribed Trazadone, an antidepressant, to help

---

[4] She also observed Plaintiff was overweight. In fact, the record reflects that Plaintiff had gained twelve pounds from when he first entered the detention facility on March 17, 1999. *Compare Miller Aff.,* Attachment at 8 *with* July 20, 1999 Treatment Notes.

with the pain and anxiety. She encouraged Plaintiff to wake warm showers, sleep on his side, increase physical activity, and engage in stress reduction activities.

*July 28, 1999:* Dr. Miller saw Plaintiff, who was seated in a wheelchair and reported that his back pain was causing numbness from his waist down his legs. According to the doctor's notes, Plaintiff said that "I know I have something wrong with the nerve in my back" and "[r]ecalled [an] episode of punctured lung in Florida that went undiagnosed for a time." *Id.* He reported that the Trazodone was making him sleepy but not helping with the back pain. Dr. Miller again performed a variety of tests to observe how Plaintiff walked, flexed, moved and responded to palpation.[5]

She observed that sometimes Plaintiff walked normally and at other times "staggers in different ways leg walking on tip toe, stumbling to one side or another, never ataxic, never showing foot drop." *Id.* She further found: no swelling in his feet; he "gets on and off exam table, scale, and wheel chair without assistance;" no "point tenderness;" no increase in pain when pressure was applied; finger to nose test within normal limits; head to shin test within normal limits; and flexible in his waist. *Id.* She assessed "subjective" back pain and problems walking. *Id.* She discontinued the Trazodone, prescribed ibuprofen with no running or jumping for a month, and assigned Plaintiff to a lower bunk on the first floor. She scheduled a follow-up visit for one week, or August 4, 1999. However, the following day, Plaintiff returned to the infirmary.

*July 29-30, 1999:* When Plaintiff "almost" fell while walking from his cell to a table in the day room, medical technician Benavidez advised him that he should be moved to the infirmary for

_____

[5] Although this may be obvious, one of Plaintiff's experts notes that these tests are a species of neurological exams. *Doc. 57,* Exh. 2, attachment at ¶ 1.C.

"closer eval[uation]." *Id.* at 3. Later, Dr. Miller noted that Plaintiff had not been complaining of pain during the day and that she would "continue to observe but still not showing a consistent pain location of symptoms that fit any known physical disease entity." *Id.*

**August 4, 1999:** In the very early morning ("0005" hours), Plaintiff reported to medical staff that he had been constipated for three days and had severe middle back pain and gas pain. Medical technician Benavidez noted:

> [Plaintiff] states he is unable to walk to the restroom or take a shower without other inmates [sic] help. "The pain is so bad it make me cry. I don't care if I have too [sic] pay." . . . Stomach was firm to touch, legs [] feet swollen [] a reddish purple color. Pt. crying while stating the above.

*Id.* She gave him a laxative, something for gas, Motrin and analgesic balm. Later in the evening of that same day, Dr. Miller noted the laxative was working, Plaintiff was

> still complaining of back pain & requesting self pay x-ray. Will order x-rays & have pt. be financially responsible for them but I need to know what part of his back he wants x-rayed. Please let me know if he wants x-rays above the waist, below the waist or both. Please to not give laxatives again to this patient without approval from me.

*Id.*

**August 5, 1999:** The next day, Plaintiff was taken to the infirmary because that he was reporting he was numb from the waist down. The nurse observed that he was able to stand holding onto the top rail of a bed and to move his feet up and down. He was also able to sit and raise his feet and move sideways. He stated, however, that he could not feel his feet and was unable to lift his knees when asked. The nurse referred him to Dr. Miller for an evaluation and Plaintiff was taken to her in a wheelchair.

Dr. Miller observed: "no facial signs of pain; calf muscles [within normal range (no sign of wasting); moves feet only when distracted;" feet pulses and temperature appropriate, knee and ankle reflexes normal; and Plaintiff was pointing to different areas of his back to identify the location of the pain but that there were no muscle spasms with palpation. *Id.* at 4. Dr. Miller assessed "low back pain" and "subjective gait disturbance." Among other things, she directed to have Plaintiff sign the financial responsibility for an x-ray of his lower and upper spine, noting although she "doubt[ed] origin of 'paralysis' is other than functional but will do tests to confirm this." *Id.* She also urged Plaintiff to "move around, stand & walk," and requested that he return for care as needed. *Id.*

**August 6, 1999:** Plaintiff signed the financial sheet and was sent to a clinic outside the detention facility for x-rays. *Id.* The portion of the medical transport form that contains a description provides:

> Lower thoracic/upper lumbar x-ray series. 36 yo H **%** who allegedly fell in shower on buttocks 6/28/00 and has had intermittent back pain since then. Back pain not exacerbated by external pressure. He claims to have waist to toe anesthesia with complete paralysis for about 1 week but is able to move feet when he thinks he is not observed or when distracted. Patellar & ankle DTR's are WNL. Pt. has promised to cooperate [with] this x-ray and stand as needed. Please fax wet reading. . . and call Dr. Miller if needed . . . .

*Id.* at 11. For some unknown reason in contravention of Dr. Miller's orders, X-rays were taken only of the lumbar area and not of the lower thoracic region. Dr. Frank Quattromani reported the results that "[e]xamination of the lumbosacral spine fails to reveal any acute injury" and his impression was "no fracture of the lumbosacral spine." *Id.* at 14. Dr. Miller asked that Plaintiff be informed of the results, and he was, although it is not clear if this all happened on the day of

the x-ray or sometime later.  *See id.* at 4, 14,15; *Doc. 88,* Exh. S-3 at 2 (indicating Plaintiff given the results eight days later).

More than two weeks passed after the x-ray before another note is entered in the medical records.  Plaintiff's affidavit indicates that he continued to suffer from worsening back pain, numbness and incontinence during this period, but he does not assert that he ever requested or was ever refused to be seen by the medical staff during this period. *Plf. Aff.* at ¶ 18; *see also Transcript.*  The supplemental witness statement of Ignacio Ochoa, a prisoner who was housed with Plaintiff, states that he does not know whether Plaintiff "put in paper . . . for the doctor." *Doc. 88,* Exh. S-3 at 2.  Rather, in terms of alleged refusals by medical personnel, Ochoa only complains about his own treatment, not Plaintiff's. *See id.*

**August 25, 1999:**  Medical technician Montgomery notes that in the afternoon Plaintiff was "offered crutches . . . to help walk around for 'physical therapy.'  He was unable to stand and support self w/crutches." *Treatment Notes,* at 5.  When Dr. Miller reviewed the note in the evening, she directed that Plaintiff be instructed to elevate his legs and put on a low sodium diet. He and the commissary were so informed. *See id.* at 5, 9.  Dr. Miller also decided to re-examine Plaintiff,  "do blood work," and to have someone from Southwest Counseling talk to Plaintiff. *Id.* at 5.

**August 27, 1999 - September 1, 1999:**  Dr. Miller notes that Plaintiff reported his "bowels [were] working well" and that he "slept well last night lying on back," but that he was numb "from the waist down," urinated on himself twice that day, and "feels bloated when he tries to stand up but otherwise feels OK." *Id.* at 5.  Among other things, she observed "no muscle wasting" but spasm after passive slow movement of his left leg and swelling in his ankles.  She

assessed him as having "low back pain – chronic/functional" but again considered his "gait disturbance of psychological origin." She prescribed blood tests for "CBT, complete metab[olic], FII, and TSH;" walking and elevation of Plaintiff's legs; and to "observe for skin breakdown & emuresia."[6]

Immediately thereafter, a counselor from Southwest Counseling met with Plaintiff. The counselor made a note that during the session that Plaintiff said "that his sister had similar 'accident' was 'paralyzed, but was later able to walk.'" *Id.* at 5. Plaintiff further related "that he believes he will be able to walk again." *Id.* The counselor assessed Plaintiff as having a "psychogenic, conversion disorder" and recommended trying hypnosis if he was still in the detention facility the following week. *Id.* A few days later, an "administrative note" in Plaintiff's medical records states he was "found lying on his back [with] his legs flexed[,] knees up." *Id.* at 6.

Two days later, the counselor saw Plaintiff again. Plaintiff related that he "had a medical problem that causes his symptoms," that his brother had developed a similar condition (kidney stones) but recovered the ability to walk; and that upon release Plaintiff was going to be examined at a hospital. The counselor assessed that Plaintiff "appears to need to hold on to his symptoms. May be malingering." *Id.* at 6. Later that day, the counselor and Dr. Miller met. She noted that all of Plaintiff's blood work was normal except for his TSH levels, which were slightly elevated indicating hypothyroidism. *See id.* at 6, 16-17. She intended to discuss the results of the blood test with Plaintiff later and to "continue to encourage [him] to return to normal functioning." *Id.*

---

[6] Emuresis is defined as a "condition in which urinary excretion and intake of water act to produce an absolute hydration of the body." *Stedman's Medical Dictionary,* 25th ed.

She also noted that Plaintiff "appears not to be having urinary incontinence today and officers witnessed him moving his legs during the night." *Id.* at 6.

*September 6, 1999:*  A correctional officer told medical technician Montgomery that he had seen Plaintiff masturbating in the early hours of the morning.  Montgomery noted the officer's observation in Plaintiff's medical file.

*September 7, 1999:*  Dr. Miller scheduled an appointment for Plaintiff to see a neurologist on September 14, 1999, just one week later. *Id.* at 7.  Neither the medical records nor Dr. Miller's affidavit indicate what, if any, change in Plaintiff's condition prompted her to do so.[7]  The medical transport order she signed on this date, however, states:

> On 8/05/99, he claims to be paralyzed from the waist down without urination or defecation problems.  However, 2 weeks ago, he began to have occasional accidents with urine or feces.  He currently has [leg] disuse atrophy & requires skin care & total assistance to shower.  He has seen a psychologist & says that 2 siblings have had the same paralysis that resolved spontaneously.

*Id.* at 13.[8]

*September 14, 1999:*  Plaintiff is released from the detention facility and family members take him to the emergency room where the tumor is discovered via an MRI.  That same day, an unidentified person from the detention facility called to cancel Plaintiff's appointment with the

---

[7]  Undisputed Fact # 23 states that Dr. Miller conferred with the neurologist Dr. Polsky, and that he had no treatment recommendation for her but offered to examine Plaintiff.  It further states that neither doctor "perceived any particular urgency at that time." *Doc. 55* at 7.  There is no support in the record for these assertions since Dr. Polsky did not provide an affidavit and Dr. Miller's affidavit only says that she called Dr. Polsky and scheduled an appointment.  Miller Aff. at ¶ 22.

[8]  Neither Plaintiff nor Defendants nor the records affirmatively indicate whether Plaintiff was informed of the appointment.  There is a notation on September 9, 1999 that "s/c entered, put appt. on calendar." *Treatment Notes* at 7.  It is not clear what "s/c" means but, in context, it does not appear to mean a notification to Plaintiff.

neurologist.  *Doc. 88,* Exh. S-4.

## III.  Summary Judgment & Amendment Standards

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence" that would justify sending the case to a jury.  *Williams v. Rice*, 983 F.2d 177, 179 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986)).  Indeed, summary judgment

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action.". . .   Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

After a responsive pleading has been filed, a plaintiff may amend the complaint only by leave of the court or upon written consent of the adverse party.  See FED. R. CIV. P. 15(a). Leave of court shall be freely granted when justice so requires.  *See id.*  However, if the court determines there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice, or futility of the amendment, leave to amend may be denied.  *See Foman v. Davis,* 371 U. S. 178 (1962).

Untimeliness alone is a sufficient reason to deny leave to amend, especially when the party

filing the motion has no adequate explanation for the delay. *See Pallottino v. City of Rio Rancho,*

31 F.3d 1023, 1027 (10th Cir. 1994).

## IV. Medical Care Claims

Count I of Plaintiff's Amended Complaint seeks compensatory and punitive damages

under § 1983 from Dr. Miller and the medical assistants for failure to provide medical care.

Count II of his tendered Second Amended Complaint seeks compensatory and punitive damages

under § 1983 from the jail administrators on alternate theories, one of which is failure to provide

medical care.

Plaintiff contends that his symptoms warranted inquiry into the possibility of a tumor and,

therefore, Dr. Miller should have discovered it by ordering the type of tests that would have ruled

out or revealed the condition. His affidavit charges that, rather than properly caring for him based

on the symptoms he related, Dr. Miller jumped to the unwarranted conclusion that he was lazy

and a malingerer and a nuisance and she did not want to spend money on tests for him. He

further states that Dr. Miller and the medical technicians treated him cruelly in trying to expose his

"ruse" by "putting food, medication, or my beside commode out of reach, and insist that I walk to

get it" and by Dr. Miller giving "orders that I was not allowed to visit my family unless I walked

to the visits." *Plf. Aff.,* ¶¶ 11, 20. He claims that because Dr. Miller and the medical technicians

refused to treat him as though he had a spinal tumor, he endured suffering from pain and the

humiliation of incontinence and having other inmates help him to function. *See id.* In short, he

asserts that he is entitled to damages because if  his tumor been diagnosed one or two months

earlier, he would not now suffer from paralysis.[9]

## A. Applicable Law

The Fourteenth Amendment right to substantive due process governs the conditions of confinement for pretrial detainees. *Lopez v. LeMaster,* 172 F.3d 756, 759 n. 2 (10th Cir. 1999). Nevertheless, Plaintiff's denial of medical care claim is analyzed under the identical standard as that applied under the Eighth Amendment — the so-called deliberate indifference test.[10] A claim for an unconstitutional medical care has two components – one objective and one subjective – and both must be met to prevail. *E.g., Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Thompson v. Gibson,* 289 F.3d 1218, 1222 (10th Cir. 2002).

## B. Objective Prong Satisfied

Under the objective prong, a "medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999)) (emphasis added). Plaintiff focuses on a "spinal tumor" as the serious medical condition.[11]   The

---

[9]  "As a result of Defendants' refusal to diagnose or treat Plaintiff's spinal tumor for two and a half (2 ½) months, Plaintiff was hospitalized for several months, and will be paralyzed below the waist for the rest of his life." *Doc. 57* at 2; *Doc. 58* at 2.

[10]  *E.g., Barrie v. Grand County,* 119 F.3d 862, 867 (10th Cir. 1997) ("pretrial detainees . . . are entitled to the same degree of protection regarding medical attention . . . . Thus, [an] inadequate medical attention claim must be judged against the 'deliberate indifference to serious medical needs' test"); *see also Purkey v. Green,* 28 Fed. Appx. 736, 2001 WL 998057 (10th Cir. 2001) (same).

[11]  "[T]here can be no question that Plaintiff's medical needs were serious; he had a cancerous tumor growing on this spine, resulting in excruciating pain, sleeplessness, edema, numbness, incontinence, eventual paralysis, and potentially, death." *Doc. 57* at 17.

presence of spinal tumor, of course, was neither previously diagnosed nor obvious to a lay person.[12] Nevertheless, the serious symptoms caused by the tumor – increasing back pain, numbness, incontinence and other symptoms Plaintiff related at the time he sought treatment – are also serious conditions, so I will assume this prong is met.

## B. Subjective Prong Not Satisfied

The subjective prong is a question of fact, akin to a criminal recklessness standard and itself a two part test:

> the official ***must both be aware of facts*** from which the inference could be drawn that a substantial risk of serious harm exists, ***and he must also draw the inference***. . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer,* 511 U.S. at 837 (emphasis added); *see also id.* at 842; *Garrett v. Stratman,* 254 F.3d 946, 949-950 (10th Cir. 2001).

Long before the *Farmer* discussion of the deliberate indifference, it was well-settled in the medical care cases that negligence, gross negligence, malpractice, misdiagnosis, differences of opinion about the appropriate course of treatment, and delays in medical care where the seriousness of the condition is not obvious, do not constitute deliberate indifference. As discussed in more detail below, the *Farmer* decision does not change that long-standing construction of constitutional analysis. *E.g., Estelle v. Gamble,* 429 U. S. 97, 107 (1976); *Smart v. Villar,* 547

---

[12]  *Compare Oxendine v. Kaplan,* 241 F.3d 1272, 1278 (10th Cir. 2001) (blackened and necrified tissue of severed finger surgically reattached objectively serious); *Sealock,* 218 F.3d at 1210 (severe chest pain, accompanied by other symptoms indicative of heart attack, meets objective test); *Hunt,* 199 F.3d at 1223 (diabetic and hypertensive inmate denied insulin although it had been prescribed by another doctor and lack of insulin allegedly resulted in heart attack and bypass surgery a year later; held to state claim under FED. R. CIV. P. 12(b)(6)).

F.2d 112, 113 (10th Cir. 1976); *see also e.g, Oxendine,* 241 F.3d at 1276; *Perkins v. Kansas Dept. of Corrections,* 165 F.3d 803, 811 (10th Cir. 1999).

### 1. Misdiagnosis Is Not Actionable Under § 1983

In essence, Plaintiff is asserting claim of delay and failure to treat based on misdiagnosis and a difference of opinion about when a more sophisticated diagnostic tool should have been employed. These allegations do not rise to the level of a federal constitutional claim. For example, in *Estelle,* the Supreme Court observed that

> Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. . . . The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F.2d, at 941. But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. *A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.*

Estelle, 429 US at 107 (emphasis added); *see also El'Amin v. Pearce,* 750 F.2d 829, 833 (10th Cir. 1984) ("even taken on its face, plaintiff's allegation that he was denied X-rays does not rise to a constitutional level"). Moreover, delay in sending Plaintiff to a specialist alone is insufficient to establish deliberate indifference. The *Farmer* subjective test must still be met. *See Garrett,* 254 F.3d at 950 n.4; *Oxendine,* 241 F.3d at 1271.

### 2. Substance Of Expert Opinions Address Malpractice And Cannot Establish Element Of Deliberate Indifference

To support his claim of deliberate indifference, Plaintiff relies on the report of his expert

Dr. Hiltz, which concludes Dr. Miller's care substandard and incompetent. Although Dr. Hiltz is "aware from [his] own experience of the natural tendency to be suspicious of malingering in forensic populations," he characterizes Dr. Miller's choice of treatment as exhibiting "callous disregard" and being "deliberately indifferent." *Doc. 57,* Exh 2. Although the content of the report focuses on Dr. Miller's choices, it also cursorily brings all defendants into its purview in its conclusion that "Detention Center personnel" were callous and indifferent. *Id.* at ¶ 1.E.[13] In his reply in support of amending the complaint, Plaintiff submits the affidavit of an expert in prison condition requirements, Vincent Nathan. Mr. Nathan reaches the same conclusion that the way everyone failed to treat Plaintiff violates "generally accepted standards of care for the administration of a correctional or detention facility." *Doc. 107,* Exh. A. at 7.

Dr. Hiltz's use of legal terms in his opinion does not change the content of his opinion, however, which speaks to substandard care and hence whether Dr. Miller committed malpractice. Furthermore, while Dr. Hiltz's opinion speaks to what Dr. Miller allegedly should have known and done, it does not speak to the second part of the *Farmer* subjective prong, which is whether she drew the inference. The same is true of Mr. Nathan's opinion. Thus, I find the expert opinions relevant to the issue of malpractice or standards of care, but not sufficient to create an issue of fact on the issue of deliberate indifference.

Alternatively, although the Tenth Circuit decision has not addressed the issue, I agree with

---

[13] Another expert, Dr. William Stevens, reached the conclusion that Dr. Miller's care was substandard, but does not include the other Defendants in his assessment and does not render any opinion on "deliberate indifference." *See Doc. 57,* Exh. 4 ("regrettable level of indifference"). A fourth expert, Dr. Harold Block, also concurs with the conclusions that Dr. Miller violated acceptable standards of care for inmates in not sending Plaintiff to the neurologist immediately is concerned that the jail does not have its own x-ray unit. Dr. Block does not use the term "deliberate indifference." *Doc. 88,* Exh. S-5.

Defendants that the better view is expert testimony should not be permitted on the element of "deliberate indifference" unless the issue is raised in the context of entitlement to qualified immunity. *See Campbell v. Sikes,* 169 F.3d 1353, 1370-71 (11th Cir. 1999); *see also Patten v. Nichols,* 274 F.3d 829, 844-45 (4th Cir. 2001); *Thompson v. Upshur County,* 245 F.3d 447, 463 (5th Cir. 2001); *Jamison v. Neilsen,* 32 Fed. Appx. 874, 877, 2002 WL 464535 (9th Cir. 2002); *but see Moore v. Duffy,* 255 F.3d 543, 545 (8th Cir. 2001).

### 3. "Obvious" Risk Does Not Eliminate Misdiagnosis/Malpractice Line Of Cases

Plaintiff contends that Defendants can be held liable under the subjective prong by virtue of the fact that he was informing the medical staff of severe symptoms that worsened and became less remitting – pain, numbness, incontinence and paralysis. Quoting a portion of the *Farmer* opinion, Plaintiff argues that based on the symptoms he reported, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Doc. 57* at 15; *Doc. 58* at 26.

It would appear that Plaintiff has collapsed the appropriate analysis. True, the undisputed facts reveal that medical staff were conscious of Plaintiff's serious symptoms and complaints. Awareness of serious medical needs, however, does not necessarily correlate with knowledge that substantial harm will result from an act or failure to act. Indeed, the subjective element inquiry necessitates that Defendants must have "known of and disregarded an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ***and must also draw the inference***." *Farmer*, 511 U.S. at 837 (emphasis added).

The *Farmer* decision clearly indicates that the objective presence of a substantial risk

alone cannot establish subjective knowledge of that risk:

> we cannot accept petitioner's argument that *Canton* compels the conclusion here that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eight Amendment if the risk was obvious and a reasonable prison official would have noticed it.

*Id.* at 841-842.  Although *Farmer* was not a medical care case and the Supreme Court has not yet applied the *Farmer* opinion in that context, the *Farmer* decision describes medical care cases where malpractice and the like are not sufficient to impose liability for damages under the federal constitution.[14]

### *4.  Other Asserted Evidence of Deliberate Evidence*

I am unable to conclude that Plaintiff has presented sufficient evidence from which a jury could reasonably find that any of the medical staff recognized or strongly suspected the serious risk to Plaintiff's health even if it could be characterized as objectively "obvious."

Plaintiff contends that deliberate indifference can be demonstrated by the defendant medical staff's continuing belief that his symptoms were of psychogenic rather than physical origin.  However, there was a basis for the conclusion that Plaintiff was either malingering or psychologically-impaired.  There is no dispute that Dr. Miller observed contradictory medical

---

[14]  Further, Tenth Circuit prison medical care decisions after *Farmer* do not suggest that the misdiagnosis/malpractice line of cases no longer apply after *Farmer*.  *E.g., Garrett,* 254 F.3d at 957 (Tacha, J. dissenting); *Oxendine,* 241 F.3d at 1277 n. 7; *Sealock,* 218 F.3d at 1211; *Perkins,* 165 F.3d at 811; *see also e.g., Purkey v. Green,* 28 Fed.Appx. 736, 2001 WL 998057 (10th Cir. 2001); *Levy v. Kafka,* 6 Fed.Appx. 822, 2001 WL 363312 (10th Cir. 2001); *Rashad v. Doughty,* 4 Fed.Appx. 558, 2001 WL 68708 (10th Cir. 2001).  Indeed, the *Farmer* opinion noted that liability under § 1983 is unwarranted if prison officials "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Farmer*, 511 U.S. at 844.

evidence during the course of her treatment that led her to conclude, at least initially, that Plaintiff's back pain and/or stumbling gait stemmed from a psychological cause. There is also no dispute that the psychological evaluation she later ordered supported her conclusion. For shorthand, I will call this a diagnosis of "malingering." But the fact that an inmate has been diagnosed as a malingerer is not grounds to find deliberate indifference. At least two courts have specifically found this to be malpractice only.[15]

For the purposes of discussion, I will assume as true the allegations Plaintiff makes in his affidavit he believes would support of a finding of deliberate indifference: (1) Dr. Miller ordered that he was not to visit his family unless he walked to the visit; (2) Dr. Miller was the one who suggested he was anxious about his legal problems and incorrectly indicated that he faced thirty years, even though Plaintiff denied being depressed; (3) Dr. Miller and the nurses tried to force him to walk when he was in the infirmary, by putting things he would be motivated to attain out of his reach (food, medicine, bedside commode); (4) when he fell out of his wheelchair during an examination, Dr. Miller refused to let anyone help him up and he dragged himself across the floor and into his chair by his arms; and (5) Dr. Miller told him he would have to determine what

---

[15] *Johnson v. Quinones,* 145 F.3d 164, 169 (4th Cir. 1998) (failure to diagnose pituitary tumor that caused inmate to go blind; summary judgment in favor of doctors on issue of deliberate indifference; court rejected argument that diagnosing inmate as malingerer is evidence of deliberate indifference because "when viewed in context, the malingerer diagnosis is simply more consistent with [the doctor's] claim that he simply missed the diagnosis" because the examinations the doctor performed did not reveal symptoms consistent with symptoms inmate related); *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 ("If [the doctors] were merely careless in their diagnosis and treatment of Hughes – being honestly convinced that he was a malingerer, as the medical reports in Hughes' file [] state – then Hughes clearly is in the wrong court. He should be pursing a malpractice action in an Illinois state court.").

portion of his back he wanted x-rayed and agree to pay for the procedure.[16]

Plaintiff argues that these assertions support the inference Dr. Miller and the medical assistants were motivated by sadistic and fiscal considerations rather than by medical considerations. Yet these assertions fail to create a material issue of fact under the subjective prong. First, none of the assertions dispute the care he did receive. Second, all of the assertions relate to Dr. Miller's diagnosis of malingering/psychological origin for which there was an objective medical basis for her conclusion. In other words, such actions could be equally consistent with the doctor testing her own diagnosis. Third and most importantly, however, none of the assertions address whether Defendants were aware of a substantial risk of harm that could be caused by these actions or a failure to act. *See Garrett,* 254 F.3d at 950 n.4; *Oxendine,* 241 F.3d at 1271.

### 5. *Plaintiff's Cases Are Unpersuasive*

The decisions Plaintiff cites in support of denying summary judgment on the second prong are all from other circuits, and either pre-date *Farmer* or involve motions to dismiss, and are distinguishable.[17]

---

[16] Dr. Miller "stridently denies" these assertions, not by any affidavit, but by virtue of a sentence by counsel in her reply. *Doc. 79* at 4.

[17] *See Doc. 57* at 18 ("In regarding Plaintiff's condition as a nuisance, and the diagnosis of that condition as an expense to be avoided, Defendant Miller's failure to diagnose and treat Plaintiff was motivated by non-medical concerns, and was deliberately indifferent. . . . In taunting Plaintiff with threats of exaggerated prison time, depriving him of basic necessities such as food, medicine, [etc. . . . all of the individual defendants were] not merely deliberately indifferent; [they] were cruel, essentially torturing Plaintiff because of his illness;" citing *Bates v. Witti,* 215 F.3d 1329, 2000 WL 518107 (7th Cir. 2000) (dismissal under 28 U.S.C. § 1915(d); *Hughes, supra* note 14 (dismissal under FED. R. CIV. P. 12(b)(6)); *Ancata v. Prison Health Servs, Inc.,* 769 F.2d 700 (11th Cir. 1985) (same; *White v. Napoleon,* 897 F.2d 103 (3rd Cir. 1990) (same)); *see also Doc. 58* at 29 (making same argument and citing same decisions).

Plaintiff relies principally on *McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999). Notably, *McElligott* holds that the doctor and nurse there could not be liable for failing to diagnose the Elmore's cancer because while "that failure . .. can be deemed extremely negligent, it does not cross the line to deliberate indifference." *Id.* at 1256. On the other hand, the *McElligott* court did reverse a grant of summary judgment on the issue of whether the doctor and nurse were "deliberately indifferent to Elmore's medical need for further diagnosis of and treatment of the severe pain he was experiencing." *Id.* at 1256-57.

I find that the facts of *McElligott* are distinguishable from the case at bar in several crucial respects because there the doctor: (1) had knowledge of a preexisting condition but was inattentive to that condition;[18] (2) did not have a reason to suspect nor actually suspected that the prisoner was malingering;[19] (3) failed to carry out prescribed treatment for a chronic condition;[20]

---

[18] Elmore had a preexisting stomach condition of five months duration and this fact was noted for the doctor. Here, Plaintiff had no such preexisting condition reported to Defendants. In *McElligott,* the doctor only visited the prison once a week and relied on the nurses to determine whether an inmate should see him. Thus, even though a prisoner's symptoms may warrant seeing a doctor, the system in that prison provided an inherent delay in receiving that care. Here, Plaintiff's pattern of visits with Dr. Miller indicates that she was at the prison different days during the week and more frequently than once a week. The course of treatment in the Eleventh Circuit decision lasted seven months and the prison doctor there only examined Elmore five times. Here, over the course of two months, Plaintiff saw Dr. Miller every time he reported to the infirmary in the daytime and the next day if he reported in the early hours of the morning.

[19] Whereas here there was objective medical evidence to support a suspicion of malingering or psychological origin, in the Eleventh Circuit decision the doctor had no reason to suspect the same and in fact never made that assessment. Rather, each time he examined Elmore, the symptoms the doctor observed were severe (vomiting, nausea, severe abdominal pain with rigidity at a light touch; and foul smelling feces) and coincided with Elmore's complaints.

[20] Elmore's doctor did run blood and urinalysis tests and prescribed medication. However, throughout the seven-month period the doctor either would not refill or ignored request to refill or delayed in refilling prescription medication that gave Elmore some relief. Thus, although the doctor prescribed a course of treatment, he did not carry it out consistently. Furthermore, Elmore's severe abdominal pain remained chronic despite the medicines. The Eleventh Circuit characterized this treatment of Elmore's pain

and (4) failed to hospitalize the prisoner despite a precipitous weight loss that suggested a cancerous condition.[21]

As for the other decisions cited by Plaintiff, again some of the cases involve dismissals under 28 U.S.C. § 1915(d) or FED. R. CIV. P. 12(b)(6), whereas the question here is whether there is sufficient evidence to submit the issue of deliberate indifference to the jury on the second prong of the *Farmer* test.[22] A number of the decisions pre-date *Farmer*.[23] Further, I agree with Defendants that all of the decisions are factually distinguishable either because they involve preexisting conditions[24] and/or a situation where the need for intervention was obvious and

---

as "so cursory as to amount to no care at all," "basically [doing] nothing to alleviate that pain, essentially letting Elmore suffer even as his condition was deteriorating." *Id.* at 1257. Here in contrast, the course of treatment prescribed for Plaintiff was carried out (medications, wheelchair, commode, crutches, physical therapy assistance, and a new cell) and as Plaintiff continued to report symptoms Dr. Miller either permitted or conducted different tests.

[21] After six months Elmore began to lose weight precipitously over the course of four weeks, and the doctor noted he was in severe pain, dehydrated, and not eating. At that point the doctor **_suspected_** cancer but did not order immediate hospitalization or fluids or something for the pain or have anyone to watch Elmore. Instead, he ordered a CT scan and chest x-ray and waited five days for the results, which showed an obstruction in the intestine. *See id.* at 1252-1254. Here, the objective medical tests, the psychological evaluation, and other noted observations supported Dr. Miller's diagnosis.

[22] *E.g., Rosenberg v. Crandell,* 56 F.3d 35 (8th Cir. 1999) (FED. R. CIV. P. 12(b)(6); "It may well be that upon trial, or even on motion for summary judgment, defendants can sufficiently explain their actions. But we are not yet at that point."); *see also e.g., Bates, supra* note 16; *Hughes, supra* note 14; *White, supra* note 16; *Ancata, supra* note 16; *Williams v. Vincent,* 508 F.2d 541 (2nd Cir. 1974) (motion to dismiss).

[23] *Durmer v. O'Carroll,* 991 F.2d 64 (3rd Cir. 1993); *Hughes, supra* note 14; *Weeks v. Chaboudy,* 984 F.2d 185 (6th Cir. 1993); *Boretti v. Wiscomb,* 930 F.2d 1150 (6th Cir. 1991); *White, supra* note 16; *Carswell v. Bay County,* 845 F.2d 454 (11th Cir. 1988); *Anacata, supra* note 16; *Williams, supra* note 21; *Gadson v. Mantello,* 1992 WL 391218 (W.D.N.Y. 1992) .

[24] *Reed v. McBride,* 176 F.3d 849 (7th Cir. 1999) (prisoner with conditions that required "life sustaining medication and food" and weekly treatment at hospital brought suit against prison administrators for failing to respond to his periodic letters informing them that his identification badge had not been returned after his trip to the hospital and therefore he was not permitted to receive the necessary food and medication; district court "dispatch[ed] with the Eighth Amendment claim in a mere three sentences with no

uncontradicted by other medical evidence but prison personnel simply ignored the prisoner's

condition.[25]

---

analysis; yet, defendants did not deny receiving the letters, knowing of the alleged deprivation, and not responding to first two letters while immediately responding to third); *Hathaway v. Coughlin,* 73 F.3d 63 (2nd Cir. 1994) (prisoner had hip fusion surgery prior to entering prison; in 1977 prison doctors discovered the hip had not fused properly but prisoner declined surgery; in 1980 prison doctors discovered three of the pins used to fuse the hip were broken but did not inform the prisoner of this condition or renew his option to elect surgery; a year later the prisoner inadvertently learned of the condition and told one doctor he would consent to surgery, but the doctor did not inform surgeon until after suit was filed); *Durmer, supra* note 22 (prisoner who suffered two strokes and automobile accident where he injured his back prior to entering prison never received any physical therapy despite that being prescribed by his treating physician, a psychiatrist concluded prisoner complaints were valid, and prison neurologist recommended physical therapy); *Hughes, supra* note 14 (on motion to dismiss; after being shot in both legs and injured in spine and hospitalized for two months, prisoner enters prison on crutches and complains of pain and is x-rayed; prisoner alleged that the doctor who saw him could see the torn vertebrae and bullet fragments around the spine but thought the prisoner's request for pain medication was "bullshit" and refused to prescribe it; a week later the prisoner told the doctor he could not feel his legs and asked for a wheelchair and to see a specialist; the doctor allegedly responded by transferring the prisoner to the psychiatric ward, taking away his crutches and leg brace, and ordering that the prisoner's bed be moved away from the toilet to force the him to walk to use it; court finds allegations sufficient to avoid dismissal but remands because medical records indicated the physicians thought the prisoner was malingering and district court did not address the alternative motion for summary judgment; court indicated that if the doctors "honestly thought that Hughes had no spinal injury and was capable of walking without crutches, then their behavior, while crass and unprofessional, would not amount to the deliberate or even reckless infliction of punishment and so would not be actionable under the Constitution;" rather, case would belong in state court on malpractice claim); *Boretti, supra* note 22 (inmate enters prison after surgery for gunshot wound to leg on crutches and with instructions for Motrin and to change dressing; prisoner had crutches taken away and was placed in a holding cell without a bed so he was forced to sleep on cement floor; nurses would not give him pain medication, change his dressings, give him materials to change it himself, or contact the doctor because it was a long holiday weekend for New Year's); *White, supra* note 16 (motion to dismiss; number of different prisoners all of whom had preexisting conditions that were being treated successfully and that treatment was disregarded by doctor when they were transferred to his prison); *Seals v. Shah,* 145 F. Supp.2d 1378 (N.D. Ga. 2001) (prisoner with high blood pressure who had an arterial graft prior to entering prison complained of achiness and numbness and pain in that leg; nurses noted discoloration and lack of pulse and other symptoms consistent with blood clot and testified that doctor did not examine on one occasion, delayed a follow-up appointment on another occasion, and refused to examine Plaintiff on other occasions; doctor denied seeing certain medical file notes but admitted that the notes raised an inference that prisoner should have been sent to emergency room immediately) *McDuffie v. Hopper,* 982 F. Supp. 817 (M.D. Ala. 1997) (mentally ill inmate with seventeen year history of severe and recurrent psychiatric illness is heavily medicated but still reporting suicidal thoughts and trying to act on them, nevertheless, his medication is discontinued).

[25] *Rosenberg, supra,* note 21 (on motion to dismiss; prisoner who over the course of two months went from having a sore throat to feeling tired out to being unable to swallow food or keep things in his

In *Coppage v. Mann*, 906 F. Supp. 1025 (E.D. Va. 1995), summary judgment was granted on similar facts even much more egregious than the case at bar. There, for three years before entering prison, an inmate sought medical assistance for a number of symptoms including back pain, numbness, and difficulty urinating. He did not reveal this medical history upon entering prison. Thus, like here, the prison medical doctor began treating Coppage without any indication he may have a preexisting condition.

Over the course of six months, Coppage visited the infirmary many times complaining of pain, numbness and other serious symptoms. Because the doctor's examinations did not reveal an objective basis for the symptoms, he became increasingly suspicious that the prisoner's complaints "were not genuine." *Id.* at 1030. After an incident where Coppage fell, struck his head, and "claimed to be numb from the waist down," he was examined at an emergency room. The x-rays were normal, showing no back injury. Thereafter, Coppage was able to walk.

A couple of months passed without incident and then, Coppage's symptoms returned – back pain, inability to walk, numbness from waist down, and incontinence. Nevertheless, the tests

stomach; physician assistants would not schedule him with an internist or give him a liquid diet; once cancer diagnosis made, correctional officers refused to allow to rest or have liquid food); *Weeks, supra* note 22 (prisoner suffering from psychologically-induced paralysis denied a wheelchair in administrative segregation and doctor refused to transfer inmate to infirmary, resulting in inmate being unable to get out of his cell, shower, care for himself or clean his cell); *Carswell, supra* note 22 (inmate labeled as a complainer and was given medicine he requested but sometimes simply ignored, he weighed 145 pounds upon entering jail but lost fifty-three pounds in eleven weeks; at his arraignment his public defender observes he is emaciated and requests medical assistance, but it is not followed up on immediately); *Gadson, supra* note 22 (factual issue whether inmate complained of numbness but nurse did not inform doctor and whether doctor did not respond to a message the next day that inmate was numb precluded summary judgment; however, nurse who responded to prisoner and arranged transport prisoner to emergency room entitled to summary judgment); *Williams, supra* note 21 (reversing grant of motion to dismiss where doctors allegedly told inmate that he did not need his severed ear and threw away the ear in front of him rather than attempting to reattach it; court noted, "Of course, it may turn out that the treatment Williams requested was impossible under the circumstances, or that there were other medical considerations which led the doctors, rightly or wrongly, merely to close the wound.").

administered by the nurses and doctor "contradicted his complaints." *Id.* at 1031. For example, Coppage could turn, bend, and sit up; his reflexes and vital sign normal; and he pointed to pain all over his spine but tenderness was inconsistent. One of the tests showed a slightly abnormal response, and though the doctor assessed Coppage's condition "as either a psychologically based conversion reaction or a lumbar sacral sprain," he ordered x-rays to rule out a sprain. *Id.*

Coppage's x-rays again were normal, but he "remained adamant that he was paralyzed from the waist down." Nevertheless, the doctor observed that he was able to move and was no longer incontinent. He again assessed a psychological origin, but arranged for a neurological consult. While awaiting receipt of a wheelchair, Coppage "spent virtually all of his time lying on his mattress or on the floor. Occasionally he was able to walk with the help of nurses, but he typically crawled to the toilet. *Id.* at 1031-32. A few weeks later he became incontinent again "and often urinated or defecated on himself." Sometimes he "had to lay in his waste." *Id.* at 1032.

On the morning of his appointment with the neurologist, Coppage defecated on himself and was not cleaned up. After sitting like that for an hour, the neurologist simply performed some sensory and reflex tests while Coppage was seated in his wheelchair. The neurologist concluded that "it was difficult to form an opinion after only one examination." *Id.* He wanted the prison physician to perform a "cremateric test and a rectal tone exam." *Id.* If those tests were normal and Coppage's "sensory levels remained inconsistent," the neurologist suspected a psychological cause. It the tests were abnormal, the neurologist recommended an MRI or bone scan, as cancer was a possibility. *Id.* at 1033.

The two tests were normal and there was discussion of transferring Coppage to another

prison, which did not appear viable. The doctor then examined Coppage again and ordered a follow-up "electromyogram" with the neurologist to rule out "tranverse myelitis." *Id.* (internal quotations omitted). Follow-up neurological testing was delayed for a month. In the interim Coppage's bedsores became so inflamed that the doctor authorized use of handcuffs to hold him in a certain position in bed. They were used on occasion. When the neurologist finally saw Coppage he decided to do an MRI, which revealed a cancerous tumor on his sacrum "that appeared to have been there for a long time." *Id.* at 1034. After six months in the hospital, Coppage became "a permanent paraplegic, with no use of this legs and no control of his bladder, bowel, or sexual functions." *Id.* at 1035.

Coppage sued, among others, the prison doctor, the neurologist, and a nurse, and the court entered summary judgment in favor of all of them. The court rejected the argument that in recommending "tests that were less effective than an MRI," the neurologist engaged in deliberate indifference. *Id.* at 1038. It also found that because Coppage's symptoms were inconsistent, there was no basis to find deliberate indifference on the part of the prison physician for failing to properly diagnose the condition and delaying Coppage from obtaining "a particular test when the doctor was continuing to provide what he thought was sufficient treatment in the interim." *Id.* at 1041. The nurse was granted summary judgment because the evidence was undisputed that she had no authority to order what Plaintiff wanted. *See id.* at 1042-43.

I find that the same result in the *Coppage* case is warranted here. Dr. Miller's failure to diagnose the tumor, refer Plaintiff to a specialist or conduct more sophisticated tests amounts to malpractice at best and will not support a federal constitutional claim for denial of medical care. Further, there was a basis for her "malingering" diagnosis and no sufficient evidence,

circumstantial or otherwise, that she drew the inference that Plaintiff was suffering from a cancerous tumor.

For these same reasons, there is no basis to hold the medical assistant or jail administrator defendants liable for a denial of medical care even if they were aware of Plaintiff's complaints, knew he and his family wanted a different course of treatment, and had the authority to send him to the hospital without Dr. Miller's approval.[26] To hold otherwise would yield an anomaly where, on an identical set of facts, a § 1983 claim would not go forward against the doctor who treated and misdiagnosed the prisoner but would go forward against nonphysicians involved with his care. At most, in light of Dr. Miller's diagnosis and the support for it, their failure to act would amount to negligence, which is not actionable under § 1983. *E.g., Garrett,* 254 F.3d at 950 & n.4; *Sealock,* 218 F.3d at 1211.

By the same token, the medical care, failure to protect, and failure to train/supervise claims against the county defendants in their official capacities and the Board in the second amended complaint[27] cannot go forward because to establish liability Plaintiff must show that a constitutional violation occurred, as well as that a county policy was the moving force behind the

---

[26] Plaintiff "anticipates" showing that the medical assistants and jail administrators had the authority to refer patients to a hospital and knew of Plaintiff's condition. *Doc. 58* at 17-20. In their affidavits the medical assistant defendants say that they only can follow doctor or nurse orders and the the detention facility administrators do not speak directly to this point. *See Doc. 51,* Exhs. 1,2,4,5.

[27] Plaintiff's second amended complaint alleges that the jail administrators "knew of several incidents of malicious and deliberate indifference to the serious medical needs" of detainees, "knew this problem to be endemic . . . and contrary to the proper administration of a detention facility," yet "did nothing to institute and enforce procedures and regulations designed to protect detainees from deliberate indifference to serious medical needs" and "knowingly placed Plaintiff in a dangerous situation" without adequately training and supervising jail employees. He alleges the failure to train/supervise and protect him amounts to a policy for which the Board is liable. *See Doc. 90,* attachment at ¶¶49-53.

violation. *E.g., City of Canton v. Harris,* 489 U.S. 378, 385 (1989); *Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1320 (10th Cir. 1998). Unlike a decision from the Third Circuit, it is settled in the Tenth Circuit that there must be an underlying constitutional violation to hold a county liable under § 1983.[28]

Finally, because the defendants' actions did not violate a constitutional or statutory right, it is unnecessary to address Defendant's entitlement to qualified immunity. *Saucier v. Katz ,*533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### 7. Plaintiff's Request for Further Discovery Is Unwarranted

---

[28] *See Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1154-55 (10th Cir. 2001) (and cases cited therein, agreeing with other courts in rejecting position taken by *Fagan v. City of Vineland,* 22 F.3d 1283 (3d Cir. 1994); "we consider whether a municipality can be held liable for the actions of its employees if those actions do not constitute a violation of a plaintiff's constitutional rights. We conclude, based on Lewis and Brown, as well as decisions from this and other circuits, as discussed below, that a municipality cannot be held liable under these circumstances."); *see also e.g., Canton,* 489 U.S. at 380, 385, 389 n.8 ("In this case, we are asked to determine if a municipality can ever be liable under 42 U.S.C. § 1983 for constitutional violations resulting from its failure to train municipal employees;" "[i]n Monell . . . we decided that a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983. . . . Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation;" "we must assume that respondent's constitutional right to receive medical care was denied by city employees"); *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Myers,* 151 F.3d at 1320 ("plaintiffs also allege that the County violated the Eighth Amendment by failing to provide attention to Mr. Myers's serious medical needs. . . . As we noted above, in order to hold a municipality liable for an employee's constitutional violations, a plaintiff must show not only that a constitutional violation occurred, but also that some municipal policy or custom was the moving force behind the violation."); *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998) ("The Supreme Court recently revisited the issue of municipal liability and held that a municipality is liable only when the official policy is the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights." *Board of County Comm'rs v. Brown,* 520 U.S. 397 (1997)) (internal quotations omitted).

Plaintiff contends that the entry of summary judgment is premature and that he should be permitted to engage in further discovery. Plaintiff wants to depose the Defendants to "impeach" their affidavits but, as noted above, he does not dispute the care he did receive. He also wants to conduct more discovery because, as noted in his reply, he has discovered other suits against the jail for claims of denial of medical care. He argues that this evidence establishes a county policy because the other suits are notice of incidents with medical personnel.

The existence of other suits are immaterial in light of the lack of a constitutional violation. Moreover, they would likely be inadmissible as irrelevant and/or inflammatory. For example, Plaintiff refers to a prisoner suit that included a medical care claim that was dismissed on the merits after a *Martinez* Report and affirmed on appeal;[29] two suits alleging rape of female inmates by a medical technician who is not a party to this suit or mentioned anywhere in Plaintiff's care, and both of which settled before any rulings on any merits relevant to this case were entered;[30] and two suits involving inmates who became incarcerated after Plaintiff had been released, one of which was settled before a decision on the motion for summary judgment and qualified immunity.[31]

Simply put, I believe that a ruling on the partial summary judgment motions on the federal claims is appropriate at this juncture as there are no disputed issues of material fact on these claims. Clearly, the tragic nature of this case and the magnitude of Plaintiff's injury evoke a

---

[29] *Mathis v. Doña Ana County Detention Center,* CIV 99-1398 LH/KBM.

[30] *Dillon v. Jackson,* CIV 00-751 MV/RLP (settled before any rulings on merits); *Ontiveros v. Terrazas,* CIV 99-1008 LH/WWD.

[31] *Scott v. Board of County Commissioners of Doña Ana County,* CIV 00-1762 JP/JHG – ACE (settled); *Lee v. Doña Ana County,* CIV 01-1363 KBM/LCS.

significant and natural emotional response. Nevertheless, a verdict for Plaintiff on his

constitutional claim could not stand and, therefore, defendants are entitled to the entry of

summary judgment on those claims. Like *Coppage,* however, even though the § 1983 claims will

not go forward, I feel compelled to add this observation:

> That [holding] is not to say that defendants deserve praise or
> commendation for the care the provided [Plaintiff] during his
> incarceration. And nothing in this opinion or ruling should be
> construed as doing so.

*Coppage,* 960 F. Supp. at 1046.

# V.  Supplemental Jurisdiction

Since the §1983 claims were the only basis for federal jurisdiction, I must decide whether

to retain supplemental jurisdiction over the remaining state claims under 28 U.S.C. § 1367(c)(3).

> If the federal claim is dismissed before trial, even though not
> insubstantial in the jurisdictional sense, the state law claim will
> generally be dismissed as well.  Notions of comity and federalism
> demand that a state court try its own lawsuits, absent compelling
> reasons to the contrary.  The district court has discretion to try
> state claims in the absence of any triable federal claims;  however,
> that discretion should be exercised in those cases in which, given
> the nature and extent of pretrial proceedings, judicial economy,
> convenience, and fairness would be served by retaining jurisdiction.

*Thatcher Enter. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990). Thus, "[a] federal

court justifiably may retain jurisdiction of the pendent claims when substantial time and energy

have been expended on the case prior to the disposition of the federal claims." *Jones v.

Intermountain Power Project*, 794 F.2d 546, 550 (10th Cir. 1986).

The Court recognizes that the parties have expended much pretrial time and energy in this

forum, and the case has been set for jury trial in November. Yet there may be compelling reasons

for declining to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(1) (federal courts

may decline to exercise supplemental jurisdiction in cases raising novel or complex issues of state law).

The County Defendants assert that the pendant state claims against them should be dismissed on the basis that sovereign immunity has not been waived by the New Mexico Tort Claims Act ("NMTCA"). Defendants Benavidez and Montgomery further contend that they are not "medical providers" within the meaning of the Medical Malpractice Act, and therefore could not provide "health services" within the meaning of the NMTCA. These arguments would seem to caution against retaining supplemental jurisdiction. *See e.g., Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995) (where complaint alleged that hospital violated the Kansas Risk Management Act, the Tenth Circuit noted that "[w]e believe the Kansas courts are the appropriate forum to decide this novel and complex issue of state law"). Therefore, I will set this issue down for oral argument by counsel.

Wherefore,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.   Plaintiff's motion to file a surreply, *Doc. 88,* is GRANTED, and Plaintiff's requests to continue the matter before deciding the dispositive motions is DENIED;

2.   Lascari's motion for summary judgment is MOOT per Plaintiff's stipulated dismissal, *Doc. 52;*

3.   Defendants' motions for summary judgment, *Docs. 50, 54,* are GRANTED as to the federal claims;

4.   Plaintiff's motion to file a second amended complaint, *Doc. 90,* is DENIED; and

5.   Oral argument from counsel will be heard on whether supplemental jurisdiction should be exercised over the remaining state claims on Friday, August 30, 2002 at 11:00 a.m. in Las Cruces.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.